# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 27, 2004      Decided December 17, 2004

No. 03-7134

Charles Haynes,
Appellant

v.

Anthony A. Williams,
Mayor, District of Columbia and
District of Columbia, Office of Chief Financial Officer,
Appellees

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00454)

———

*David A. Branch* argued the cause and filed the briefs for appellant.

*Mary E. Pivec* argued the cause for appellees. With her on the brief were *Robert J. Spagnoletti*, Attorney General, Office of the Attorney General for the District of Columbia, *Edward E. Schwab*, Deputy Attorney General, and *Donna M. Murasky*, Senior Litigation Counsel.

Before: EDWARDS and GARLAND, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

GARLAND, *Circuit Judge*: Charles Haynes, a former budget analyst for the District of Columbia, sued the District and its Mayor for allegedly discriminating against him in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.* The district court granted summary judgment for the defendants on the ground that Haynes had failed to raise a genuine issue that he was disabled within the meaning of the Act. We affirm.

I

Viewing the evidence in the light most favorable to Haynes, *see Breen v. Department of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002), the facts are as follows. In 1980, Haynes began working as a budget analyst in the District of Columbia's Department of Budget and Planning. Sometime in 1992, Haynes developed a "severe medical condition, which seemed to be exacerbated by the work environment" at 441 4th Street, N.W., where the Department had its offices. Haynes Aff. ¶ 11 (J.A. 38). Haynes described his condition as "a sense of insects crawling on my skin causing severe irritation, occurring shortly after I arrive at work." *Id.* In 1996, Haynes and several co-workers filed a formal complaint with the District of Columbia's Office of Occupational Safety and Health (OSH). Although the District sprayed the offices for "bugs and other flying insects," Ex. D, Pl.'s Opp'n to Defs.' Mot. for Summary J., Haynes' condition did not abate. In April 1997, Haynes filed an OSH complaint in which he stated that his continuing discomfort was caused by "environmental conditions in the building." 4/11/97 Haynes Mem. at 1 (J.A. 64).

In 1997, Haynes also began visiting an allergist, Dr. James Mutcherson, who conducted a battery of skin tests. Mutcherson diagnosed Haynes as "a most allergic individual," 1/21/00 Mutcherson Letter at 3 (J.A. 29), who suffered from "idiopathic pruritus," a condition "that appear[ed] to be exacerbated by" his work environment. *Id.* at 1 (J.A. 27). Haynes was "rather emphatic" in telling Mutcherson that there was "something present at work that elicit[ed] the most intense and prolonged skin symptom[]" — a "severely incapacitating skin itching." *Id.* at 3 (J.A. 29).

Although the itching would begin soon after Haynes arrived at work, it would continue after he returned home at the end of the day. *See* 9/25/98 Haynes Mem. at 3-5 (J.A. 80-82). Haynes believed that he was bringing home on his clothes whatever it was that aggravated his condition at work. As a result of the itching, he often could not fall asleep until 4:00 a.m. or later, typically getting under four hours of sleep. *See id*. at 5 (J.A. 82); Haynes Dep. at 74 (J.A. 164). And because Haynes had so much trouble sleeping, he also had trouble arriving at work on time. Often, he would not arrive at the office until the afternoon. Haynes Dep. at 144-49 (J.A. 181-83).

In 1996-97, the Department of Budget and Planning was transferred from the Office of the Mayor to the Office of the Chief Financial Officer, where it became the Office of Budget and Planning. Anthony Williams, who later became the District's Mayor, was the Chief Financial Officer (CFO) at the time. After the transfer, Williams terminated the Office's prior "liberal attendance policy and required all budget and accounting personnel to report for work from 8:15 a.m. to 4:45 p.m." Defs.' Statement of Material Facts ¶ 7.

Haynes' schedule did not comport with the new policy. In a memorandum dated September 17, 1997, Haynes' supervisor

"inform[ed] him that he needed to comply with the attendance policy and report to the office by no later than 9:30 a.m." *Id*. ¶ 8. A year later, Haynes' September 1998 performance appraisal again warned that he "[n]eed[ed] to adjust his work schedule so that he [could] work during regular working hours and be a more effective team player." 9/15/98 Performance Evaluation at 3 (J.A. 60). Haynes responded with a lengthy memorandum, advising that he had "acquired an allergic reaction to something that lives within this building." 9/25/98 Haynes Mem. at 2 (J.A. 79). He complained that the District had failed to test his office's air quality and to accommodate him with a work schedule that would permit him "to come to work at later times when [he] suffered sleep deprivation." Haynes Aff. ¶ 24 (J.A. 43).

On January 25, 1999, Haynes met with his supervisors, who told him that "his failure to work during the regular business hours was preventing him from being fully productive and was becoming an inconvenience to his coworkers." Defs.' Statement of Material Facts ¶ 12. In response to Haynes' complaints about the building, the defendants hired specialists to test limited aspects of its air quality, tests that found no significant problems. *Id.* After receiving the results of the air quality tests, Haynes' supervisor advised him that the Office "would no longer tolerate his excuses for failing to report within normal duty hours." *Id.* ¶ 13. Haynes' September 30, 1999 performance evaluation reported that he "still failed to maintain a work schedule that meets his assigned regular tour of duty," 9/30/99 Performance Evaluation at 3 (J.A. 119), an allegation that Haynes did not deny, *see* Haynes Dep. at 144-49 (J.A. 181-83) (acknowledging that, in 1999, Haynes typically reported to work between 1:00 p.m. and 1:30 p.m., and sometimes as late as 5:00 p.m.).

On January 14, 2000, the Office of the CFO terminated Haynes' employment. Thereafter, he sued the District of Columbia and Mayor Williams (collectively, "the District") in the United States District Court for the District of Columbia. Haynes alleged that the District had violated the ADA by failing reasonably to accommodate his claimed disability and by discharging him based on that disability.[1]

Following discovery, the District moved for summary judgment. Concluding that Haynes had not raised a genuine issue of fact as to whether he was disabled within the meaning of the ADA, the district court granted the District's motion and dismissed the case. *See Haynes v. Williams*, 279 F. Supp. 2d 1, 2 (D.D.C. 2003).

## II

We review the district court's grant of summary judgment de novo. *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute about a material fact is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* at 248, and a moving party is "entitled to a judgment as a matter of law" if the nonmoving party "fails to make a showing sufficient to

---

[1]Although Haynes also alleged that the District had violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, he presents no arguments unique to that statute. *See generally Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (noting that the ADA provides "at least as much protection as provided by the regulations implementing the Rehabilitation Act") (citing 42 U.S.C. § 12201(a)).

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The ADA bars a covered employer from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to . . . employment." 42 U.S.C. § 12112(a). The ADA defines discrimination to include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A). A "disability," in turn, is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual." *Id.* § 12102(2)(A).[2] Accordingly, a plaintiff is disabled under the ADA if: (1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial. *See Bragdon*, 524 U.S. at 630-31; *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1167 (1st Cir. 2002). It is the plaintiff's burden to prove that he is disabled. *See Swanks*

---

[2] The ADA's definition of disability also includes "a record of such an impairment," 42 U.S.C. § 12102(2)(B), or "being regarded as having such an impairment," *id.* § 12102(2)(C). Although Haynes makes no claim in reliance on the "record" prong, *see Haynes*, 279 F. Supp. 2d at 8 n.7, he does contend that the defendants "regarded" him as having an impairment that substantially limited a major life activity. A person is "regarded as" disabled if his employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). We agree with the district court that "there is no evidence that the defendants erroneously believed that the plaintiff suffered from an impairment that substantially limited a major life activity." *Haynes*, 279 F. Supp. 2d at 12.

*v*. *Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999); *see also Bailey*, 306 F.3d at 1167.

The district court accepted Haynes' contentions that he had a physical impairment, idiopathic pruritus, and that it limited Haynes' sleeping — which the District did not dispute was a major life activity under the ADA. Because the District does not contest these points on appeal, *see* Br. for Appellees at 12, we do not address them here. *Cf. Sutton v. United Air Lines*, 527 U.S. 471, 492-94 (1999) (analyzing an ADA claim while assuming, without deciding, that working is a major life activity).[3]

Although the district court ruled in Haynes' favor with respect to the first two elements of the definition of "disability," it ruled against him on the third: the court concluded that Haynes had failed to raise a genuine issue that "the extent of his sleeping limitation [was] substantial within the meaning of the ADA." *Haynes*, 279 F. Supp. 2d at 10. One reason the court gave for this conclusion was that Haynes had failed to submit expert medical testimony "regarding the extent to which [his] physical impairment impacted his ability to sleep." *Id.* Instead, the court said, Haynes had relied on his own "self-serving assertions," a kind of evidence the court regarded as insufficient. *Id.*

In that respect, the court erred. As the Supreme Court said in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, "the

---

[3]Several circuits have held that sleeping is a major life activity under the ADA. *See, e.g., Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998); *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352-53 (4th Cir. 2001); *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999).

ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation . . . *in terms of their own experience* . . . is substantial.'" 534 U.S. 184, 198 (2002) (emphasis added) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)).  Whatever the comparative credibility of medical versus personal testimony, a plaintiff's personal testimony cannot be inadequate to raise a genuine issue regarding his "own experience."  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

The district court did, however, suggest another ground upon which its grant of summary judgment is properly based: Haynes' failure to offer evidence that any location other than his office triggered his itching to such an extent that it seriously limited his ability to sleep.  *See Haynes*, 279 F. Supp. 2d at 11. Haynes concedes that if the symptoms of an impairment are brought on by a single workplace, such an impairment is not substantially limiting within the meaning of the ADA.  Oral Arg. Tape at 9:35-10:05.

That concession is appropriate. *See Muller v. Costello*, 187 F.3d 298, 314 (2d Cir. 1999) (finding that the plaintiff was not disabled because there was "not enough evidence of off-the-job breathing problems to find a substantial limitation of that life activity").  In *Toyota*, the Supreme Court held that to be substantially limiting, an "impairment's impact must . . . be permanent or long term."  534 U.S. at 198 (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).[4]  If the impact of an impairment can be

---

[4]Although *Toyota* articulated this requirement in the context of the major life activity of performing manual tasks, nothing in the

9

eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term. Similarly, in *Sutton*, the Court held that "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." 527 U.S. at 475; *see id.* at 488-89 (holding that, because the petitioners' visual impairments could be corrected by wearing glasses, the petitioners were not substantially limited in the major life activity of seeing).[5]  If Haynes could have avoided the itching that seriously affected his sleep simply by working at a different location, then he was not "substantially limited" in the major life activity of sleeping.  Indeed, were we to hold that a plaintiff can recover under the ADA based on a condition that becomes limiting only when he works in a single building, we would transform the ADA into an occupational safety and health statute.[6]

---

Court's opinion suggests that the requirement would not apply in other contexts as well.  Indeed, the EEOC regulation that the *Toyota* Court cited in support of the requirement does not distinguish among major life activities.  *See* 29 C.F.R. § 1630.2(j)(2)(iii) (stating that the factors determining whether a limitation is substantial include "[t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment").

[5]*See also Albertson's*, 527 U.S. at 565-66 (holding, with respect to the requirement that "mitigating measures be taken into account," that there is "no principled basis for distinguishing between measures undertaken with artificial aids, like medications and devices, and measures undertaken . . . with the body's own systems").

[6]Of course, if Haynes had needed to avoid many workplaces in order to mitigate his impairment, he might have argued that he was substantially limited in the major life activity of working.  But he does not make that claim here.

Although Haynes concedes that he cannot recover if he could have eliminated his sleep problem by avoiding his office, he contends that the evidence shows his condition was triggered by other locations as well. This case, he says, is therefore similar to *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242 (10th Cir. 2004). In *Albert*, the court found disabled a plaintiff whose asthma attacks, which impaired her breathing, were "activated by an array of common substances" and "require[d] her to avoid a wide variety of everyday situations." *Id.* at 1250. Similarly, in *EEOC v United Parcel Service, Inc.*, the court found for a plaintiff who developed a serious reaction to a local allergen that impaired his ability to breathe and that he could avoid only by moving away from central Texas, where he lived. *See* 249 F.3d 557, 559, 562-63 (6th Cir. 2001).

The evidence before the district court, however, was nothing like that in *Albert* or *EEOC*. There was no evidence that Haynes could have obtained relief only by avoiding "a wide variety of everyday situations" or by moving out of the geographic area in which he lived. Rather, the evidence was that Haynes' inability to sleep derived from his reaction to the building in which he worked. In the April 1997 complaint he filed with the Office of Occupational Safety and Health, Haynes wrote: "I believe that the cause of my distress . . . is to be found living in various stages of life within this workplace, i.e., 441 [4th] St. N.W.," and that "[b]efore this experience I have never felt this way even after working in the dirtiest building or in the deepest woods." 4/11/97 Haynes Mem. at 2-3 (J.A. 65-66). He therefore called upon that Office to send "to this building the appropriate professionals who will discover whatever is going wrong within this place and set into motion the measures that will make it completely comfortable." *Id.* at 4 (J.A. 67); *see also* 5/19/97 Haynes Mem. at 1-2 (J.A. 68-69) (notifying supervisors of his "complaints about the environmental conditions within this workplace," and stating that "[n]o matter

how I feel when I enter into this workplace each day, I leave here on most days feeling badly").

Similarly, in his memorandum responding to his September 1998 performance evaluation, Haynes told his supervisors: "I have acquired an allergic reaction to something that lives within this building . . . . I believe that the cause of my distress . . . is to be found living and flourishing within the confines of this workplace . . . ." 9/25/98 Haynes Mem. at 2 (J.A. 79). And he sought to substantiate that point by noting that his symptoms would begin "within about twenty minutes of my entering this office." *Id.* at 3 (J.A. 80). Haynes repeated these statements, verbatim, in the affidavit he filed in opposition to summary judgment. Haynes Aff. ¶¶ 19, 21 (J.A. 40-41); *see also* Mutcherson Dep. at 38 (J.A. 55) ("[I]t would always go back to something on the job that created these problems . . . ."); Summary of 1/25/99 Personnel Meeting (J.A. 121) (reporting that Haynes "explained . . . that, in his opinion, the cause of [his] condition originates from the Office of Budget and Planning; more specifically his office").

To support the contention that his condition was triggered by locations other than his workplace, Haynes relies on the statement in his 1998 memorandum that he had allergic reactions "within the office *and in some other places*." 9/25/98 Haynes Mem. at 2 (J.A. 79) (emphasis added). Those "'other' places include[d] some retail stores — mainly the smaller ones [—] and some closed ventilation office buildings." *Id.* They did not, however, include "residential spaces, i.e., except for [his] own." *Id.*; *see also* 1/21/00 Mutcherson Letter at 3 (J.A. 29) (noting that Haynes "is not solely symptomatic at work, as he

has experienced symptoms at home and while visiting department stores locally and out of town").[7]

Haynes' claim that he suffered itching in "some" places other than his office does not approach the scope of the impairment in *Albert* or in *EEOC*. More important, Haynes offered *no* evidence that the itching brought on by those other locations disturbed him to such a degree that he could not sleep. The absence of such evidence is crucial. As the Court held in *Toyota*, "[i]t is insufficient for individuals attempting to prove disability . . . to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [on a major life activity caused by that impairment] . . . is substantial.'" *Toyota*, 534 U.S. at 198 (emphasis added) (quoting *Albertson's*, 527 U.S. at 567).

At oral argument, Haynes' counsel argued that, because Haynes had testified that his itching *at work* substantially limited his ability to sleep, a jury could have inferred that his itching *elsewhere* had the same effect. There are two flaws in this argument. First, the evidence in the record was that the itching Haynes experienced in other environments was of "a

_____

[7]There is also Dr. Mutcherson's statement (relating Haynes' complaints) that "[t]here was no place, no haven for him to get relief, particularly." Mutcherson Dep. at 21 (J.A. 51). This statement followed two others in which Mutcherson referred to Haynes' complaints about itching at his workplace. But even if this reference was intended to be more general, it does not overcome the problem discussed above: Mutcherson never testified that whatever itching resulted from Haynes' contact with other locations was severe enough to seriously limit his ability to sleep. To the contrary, Mutcherson testified that "clearly most of his problems — that is, most of his severe problems — occurred at work." *Id.* at 23 (J.A. 51).

much lesser degree than at [his] workplace." Haynes Dep. at 66 (J.A. 162). Indeed, in the same memorandum in which he said that he suffered allergic reactions in "some other places," he specifically noted that "no other place has affected me as severely as 441 4th Street." 9/25/98 Haynes Mem. at 2 (J.A. 79). And in his deposition testimony, Haynes declared that in those other places, unlike in his own office, "a lot of times the degree that [the itching] was bothering me did not hamper me doing what I was doing." Haynes Dep. at 66 (J.A. 162).

Second, as Haynes acknowledges, it was he who bore the burden of establishing that his impairment substantially limited his sleeping. *See* Appellant's Br. at 14 (citing *Bailey*, 306 F.3d at 1167). Although we must give Haynes the benefit of all reasonable inferences from the evidence in the record, evidence that is "merely colorable or not significantly probative" cannot create a genuine issue of material fact. *Bragdon*, 524 U.S. at 653 (citing *Anderson*, 477 U.S. at 249-50). The possibility that a jury might speculate in the plaintiff's favor is insufficient to defeat summary judgment. *See Rogers Corp. v EPA*, 275 F.3d 1096, 1103 (D.C. Cir. 2002).

At most, then, the plaintiff's evidence would have supported a finding that *some* locations other than his workplace bothered him to *some* extent. Such evidence would not have permitted a reasonable jury to conclude that Haynes was substantially limited in a major life activity. Accordingly, the district court's grant of summary judgment in favor of the defendants was appropriate.

### III

For the foregoing reasons, we conclude that the evidence fails to raise a genuine issue that Haynes had a disability within

14

the meaning of the ADA. The judgment of the district court is therefore

*Affirmed.*

1

WILLIAMS, *Senior Circuit Judge*, concurring: I write separately only to question the premise, assumed by all parties (and thus quite properly not ruled on by the court), that "sleeping" is "a major life activit[y]" for purposes of the Americans with Disabilities Act, specifically 42 U.S.C. § 12102(2)(A). Here no analytical problem arises, because Haynes loses for want of evidence that his impairment, idiopathic pruritus, *caused* his sleeplessness. But had he prevailed on that question, the next issue would have been whether the impairment "substantially" limited his sleeping. See *id.* Not only is sleep largely an instrumental activity—valued for its ability to refresh us for various waking activities—but humans' sleep needs vary radically. Some can be successful chief executives of firms—or countries—on very little sleep, while others require a full eight hours, or more, to get through only moderately productive days. See, e.g., *Only Wimps Need 8 Hours*, L.A. Times, Feb. 10, 1994, at 1 ("Winston Churchill slept little and sometimes ridiculed those who slept more."). Thus the only way to answer the question whether the impairment "substantially" limited Haynes's sleep would be by reference to the effects on his waking "life activities." A more direct answer to that question would look straight to the waking activities adversely affected. The intermediate step seems to add nothing useful.